UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARY ANN CORETTE and JOHN CORETTE, | ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| vs. | ) ) | JURY TRIAL |
| DEPUY ORTHOPAEDICS, INC., ET AL., | ) ) | DEMANDED |
| Defendants. | ) ) | |

## NOTICE OF REMOVAL

Defendants DePuy Orthopaedics, Inc. ("DePuy"), DePuy Products, Inc., DePuy

International Limited, Johnson & Johnson, and Johnson & Johnson Services, Inc. (collectively,

"removing defendants"), through undersigned counsel, hereby remove the state-court action

entitled *Mary Ann Corette v. DePuy Orthopaedics, Inc.*, Civil Action No. CAV-14-19666, filed

in the Circuit Court for Prince George's County.  Removal is warranted under 28 U.S.C. §

1441(b) because the Court has original jurisdiction over this action under 28 U.S.C. § 1332.

In support of removal, removing defendants state as follows:

1.     On or about July 22, 2014, plaintiffs commenced this action against the removing

defendants and Chesapeake Surgical Ltd. ("Chesapeake") by filing a complaint in the Circuit

Court for Prince George's County, in the State of Maryland, bearing case number CAV-14-

19666.

2.     In this action, plaintiffs allege that Ms. Corette suffered various injuries as a result

of being implanted with a Pinnacle Acetabular Cup System ("Pinnacle Cup System")

manufactured and sold by DePuy.  (Compl. ¶¶ 91-107.)

3.     This is one of more than 6,500 similar cases pending around the country involving

personal-injury allegations by plaintiffs who were implanted with a Pinnacle Cup System

manufactured by DePuy.  On May 23, 2011, the Judicial Panel on Multidistrict Litigation issued an order establishing MDL No. 2244, *In re: DePuy Orthopaedics Inc., Pinnacle Hip Implant Products Liability Litigation*, before Judge Ed Kinkeade in the United States District Court for the Northern District of Texas.

4.     Removing defendants intend to seek the transfer of this action to that proceeding, and will shortly provide the MDL Panel notice of this action pursuant to the "tag-along" procedure contained in the MDL Rules.

5.     As set forth more fully below, this case is properly removed to this Court pursuant to 28 U.S.C. § 1441 because the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, and removing defendants have satisfied the procedural requirements for removal.

## I.     REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER JURISDICTION PURSUANT TO 28 U.S.C. §§ 1332 AND 1441.

6.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441 because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different States.

### A.     Complete Diversity Of Citizenship

7.     Plaintiffs are citizens of the State of Maryland.  (Compl. ¶ 3.)

8.     DePuy and DePuy Products, Inc. are, and were at the time plaintiffs commenced this action, corporations organized under the laws of the State of Indiana with their principal places of business in Warsaw, Indiana.  They are thus citizens of the State of Indiana for purposes of determining diversity.  28 U.S.C. § 1332(c)(1).

9.     DePuy International Limited is, and was at the time plaintiffs commenced this action, a corporation organized under the laws of the United Kingdom with its principal place of

business in Leeds, England, and is therefore a citizen of the United Kingdom for purposes of determining diversity. 28 U.S.C. § 1332(c)(1).

10.    Johnson & Johnson and Johnson & Johnson Services, Inc. are, and were at the time plaintiffs commenced this action, corporations organized under the laws of the State of New Jersey with their principal places of business in New Brunswick, New Jersey. They are thus citizens of the State of New Jersey for purposes of determining diversity. 28 U.S.C. § 1332(c)(1).

11.    There is thus complete diversity between plaintiffs and the removing defendants.

12.    Although defendant Chesapeake is alleged to be a resident of Maryland (Compl. ¶ 14), it is a fraudulently-joined defendant, whose citizenship must be disregarded by the Court. *See Coots v. Allstate Life Ins. Co.*, 313 F. Supp. 2d 539, 541 (D. Md. 2004) (the fraudulent-joinder "doctrine allows the district court to disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction") (internal quotation marks and citation omitted). Pursuant to the fraudulent-joinder doctrine, a court should disregard the citizenship of an in-state defendant where, as here, "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court." *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 719-20 (D. Md. 2000) (internal quotation marks and citation omitted).

13.    Plaintiffs allege a number of claims against Chesapeake, including: (1) strict liability; (2) negligence; (3) negligent misrepresentation; (4) loss of consortium; and (5) violation of the Maryland Consumer Protection Act ("MCPA").[1] Although plaintiff is a citizen of Maryland, her claims are governed by Virginia law under Maryland's choice-of-law rules,

---

[1]    Plaintiffs also assert claims for alleged breaches of express and implied warranties, but not against Chesapeake. (*See* Compl. ¶¶ 149-65.)

because that is where she claims to have received her hip implant. (*See* Compl. ¶ 93.) *See Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000) ("Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in torts."); *Williams v. Gyrus ACMI, Inc.*, 790 F. Supp. 2d 410, 414-15 (D. Md. 2011) (applying Virginia law to Maryland resident where plaintiff's surgery occurred in Virginia). As set forth below, there is no possibility that plaintiffs can prevail on any of her claims against Chesapeake under Virginia law.

14.     *First*, all of plaintiffs' claims against Chesapeake fail as a matter of law because they are preempted. *See PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2581 (2011); *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013).

15.     In *Mensing*, the U.S. Supreme Court ruled that all claims against generic drug manufacturers that were premised on a failure to warn are preempted by federal law based on the principle of impossibility preemption. 131 S. Ct. at 2581. According to the Supreme Court, generic manufacturers cannot be found liable on a failure-to-warn theory because generic manufacturers have no power to unilaterally effectuate a label change; rather, they must use the same labels and warnings as those approved by the FDA with respect to the brand-name version of the drug. *Id.* at 2575-76. Thus, as long as the labels and warnings for the generic form of the drug match the labels and warnings that the FDA has approved for the brand-name form of the drug, generic manufacturers cannot as a matter of law be held liable under state tort law for failing to warn.

16.     Although *Mensing* involved failure-to-warn claims, the Supreme Court has reached a similar conclusion as to product-design claims as well. In *Bartlett*, the Supreme Court held that a generic manufacturer could not "legally make [the generic product] in another

composition" under the Federal Food, Drug, and Cosmetic Act ("FDCA"). *Bartlett*, 133 S. Ct. at

2475 (internal quotation marks and citation omitted). As the Court explained, "the FDCA

requires a generic drug to have the same active ingredients, route of administration, dosage form,

strength, and labeling as the brand-name drug on which it is based." *Id.* (citing 21 U.S.C. §§

355(j)(2)(A)(ii)-(v) and (8)(B); 21 C.F.R. § 320.1(c)). Because it was "not possible" for the

generic manufacturer defendant in *Bartlett* to "redesign" the product at issue to make it more

useful or less risky, the Court concluded that causes of action based on a defective design are

likewise preempted. *See id.*; *see also Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 187 (5th

Cir. 2012) ("[W]e are persuaded that [plaintiff's] design defect claim [against generic

manufacturer] would be preempted [under *Mensing*]."), *cert. denied*, 134 S. Ct. 57 (2013);

*Gardley-Starks v. Pfizer, Inc.*, 917 F. Supp. 2d 597, 611 (N.D. Miss. 2013) (design-defect claims

"are also preempted"); *In re Pamidronate Prods. Liab. Litig.*, 842 F. Supp. 2d 479, 484

(E.D.N.Y. 2012) ("the 'federal duty of sameness,' also applies in the context of generic drug

design") (internal quotation marks and citations omitted).

     17.    As other courts have found, these principles apply in spades to distributors such as

Chesapeake. After all, these defendants have "no authority" to effectuate changes to the product

or its labeling either. *See, e.g., In re Fosamax Prods. Liab. Litig.*, MDL No. 2243 (JAP-LHG),

No. 3:08-cv-00008-JAP-LHG, 2012 U.S. Dist. LEXIS 5817, at *26-28 (D.N.J. Jan. 17, 2012)

(because a distributor "ha[d] no authority to initiate a labeling change" and "no power to

unilaterally change Fosamax labeling," it "could not independently do under federal law what

state law requires of it"); *see also Stevens v. Cmty. Health Care, Inc.*, No. ESCV200702080,

2011 WL 6379298, at *1 (Mass. Super. Ct. Oct. 5, 2011) ("As a distributor, however, [the

defendant] had no ability to change labeling or warnings and thus, like a generic manufacturer,

[it] cannot be subject to liability in connection with a state law claim premised on a 'failure to warn.'").

18.    In *In re Fosamax*, for example, the court granted a distributor's motion for judgment on the pleadings after finding that the plaintiffs' state-law claims were preempted. 2012 U.S. Dist. LEXIS 5817, at *26-28. The plaintiffs in *Fosamax* asserted a number of claims against "the authorized distributor of branded Fosamax" that "emanated from a general theory of failure to warn," including "defective design, negligence, fraud, misrepresentation, breach of express and implied warranties, violation of consumer protection statutes, restitution, and loss of consortium." *Id.* at *20-21. In rejecting the plaintiffs' claims, the district court ruled that "[a]s a distributor of Fosamax, [the distributor] ha[d] no power to change Fosamax labeling." *Id.* at *27. According to the court, "[t]hat power lies with the applicant who . . . seek[s] approval to market Fosamax" – in that case, Merck. *Id.* at *27. Additionally, the court noted that if the FDA had become aware of new safety information in connection with Fosamax use that it believed should be included in the labeling, the FDA would have notified Merck – not the distributor. *Id.* Because the distributor "ha[d] no authority to initiate a labeling change" and "no power to unilaterally change Fosamax labeling," it "could not independently do under federal law what state law requires of it." *Id.* at *28 (citing *Mensing*, 131 S. Ct. at 2579) (internal quotation marks omitted). Accordingly, the court found that "the state law claims brought against [the distributor] [were] preempted." *Id.*

19.    Precisely the same reasoning applies here. All of plaintiffs' claims rest on either a failure-to-warn theory or a defective-design theory. But Chesapeake was not "involved with the design, manufacture, development, testing, labeling, or packaging of DePuy orthopedic implants, including the products allegedly at issue in this case." (*See* Decl. of David Donahower

("Donahower Decl.") ¶ 3, *Flach v. DePuy Orthopaedics, Inc.*, No. 1:12-cv-02112 (D. Md.)

(attached as Ex. 1); *see also* Compl. ¶ 109 (alleging that "Defendants designed (DEPUY only)

[and] manufactured (DEPUY only)" the Pinnacle Cup System).)

20.    Because Chesapeake had "no power to unilaterally change" either the design of the

FDA-regulated Pinnacle Cup System – or the warnings that accompanied it – all of plaintiffs'

claims against Chesapeake are barred as a matter of federal law. *See, e.g., Gross v. Pfizer, Inc.*,

825 F. Supp. 2d 654, 659 (D. Md. 2011) (*Mensing* preempted all of plaintiff's claims, including

those based on plaintiff's allegations that the defendant was "negligent for continuing to sell

metoclopramide with an inadequate label, for continuing to sell a product that was not fit for the

purpose for which it was sold, and for continuing to place an unreasonably dangerous product

into the stream of commerce"), *aff'd sub nom. Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th

Cir. 2014); *Morris v. Wyeth, Inc.*, No. 3:09-CV-854, 2011 WL 4973839, at *1 (W.D. La. Oct. 19,

2011) (dismissing plaintiff's claims for defective construction or composition, defective design,

breach of express warranty, and inadequate warning under *Mensing*), *aff'd*, 713 F.3d 774 (5th

Cir. 2013); *Lashley v. Pfizer, Inc.*, 877 F. Supp. 2d 466, 480-81 (S.D. Miss. 2012) (rejecting

plaintiffs' contention that it was error for the court to find their claims for "failure to warn,

negligence, strict liability, breach of warranty as to merchantability, breach of warranty as to

fitness for a particular purpose, misrepresentation, and fraud" preempted under *Mensing*), *aff'd*,

750 F.3d 470 (5th Cir. 2014); *Strayhorn v. Wyeth Pharm., Inc.*, 887 F. Supp. 2d 799, 820 (W.D.

Tenn. 2012) (the "civil conspiracy claim sounds in failure to warn, which is preempted by

*Mensing*"), *aff'd*, 737 F.3d 378, 400 (6th Cir. 2013).

21.    *Second*, even if plaintiffs' claims against Chesapeake were not preempted under

*Mensing* and *Bartlett*, they would still have no chance of success under Virginia law.

22.   **Strict Liability.**  Plaintiffs' strict-liability claims against Chesapeake cannot form the basis for any liability because Virginia law does not allow recovery for product-liability claims based on a strict-liability theory. *See Harris v. T.I., Inc.*, 413 S.E.2d 605, 609-10 (Va. 1992) (explaining that "the doctrine of strict liability . . . is not recognized in Virginia"); *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 57 n.4 (Va. 1988) ("Virginia law . . . does not permit tort recovery on a strict-liability theory in products-liability cases."). Accordingly, courts applying Virginia law have routinely dismissed complaints purporting to assert strict-liability claims. *See, e.g., Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) ("Because Virginia has not recognized strict liability in tort, the district court properly dismissed [plaintiff's] strict liability count for failure to state a cause of action."); *Sykes v. Bayer Pharm. Corp.*, 548 F. Supp. 2d 208, 214 (E.D. Va. 2008) (finding that strict-liability claim failed as a matter of law because Virginia courts "have not applied the doctrine of strict liability in product liability cases"); *St. Jarre v. Heidelberger Druckmaschinen A.G.*, 816 F. Supp. 424, 427 (E.D. Va. 1993) (dismissing claim because "it is beyond question that Virginia does not recognize a cause of action for strict liability in tort"). Indeed, because strict-liability claims in Virginia have no viability, federal courts have found that asserting such claims is sufficient grounds for Rule 11 sanctions. *See, e.g., Cross v. S.V.H.H. Cable Acquisition Ltd. P'ship*, No. 95-0007-D, 1995 U.S. Dist. LEXIS 18659, at *8 (W.D. Va. Nov. 2, 1995) ("The assertion of strict liability in tort is, in itself, sufficient grounds for Rule 11 sanctions.").

23.   **Negligence.**  Plaintiffs' negligence claim against Chesapeake would similarly have no possibility of success because plaintiffs cannot establish that Chesapeake owed any independent duty to them.

24.   Distributors do not have a duty, under negligence law, to test or inspect a product. *McLaurin v. E. Jordan Iron Works, Inc.*, 666 F. Supp. 2d 590, 601-02 (E.D.N.C. 2009) (noting the "general rule" that a "non-manufacturing seller who is acting as a 'mere conduit' of the product has no affirmative duty to inspect and test a product made by a reputable manufacturer"); *see also Dameron v. Fort Worth Steel & Mach. Corp.*, No. LE 1626, 1985 WL 306781, at *7-8 (Va. Cir. Ct. Mar. 26, 1985) (defendant owed no duty where it "only acted as the distributor" and neither "manufactured [n]or designed the finished product"); *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 947 (8th Cir. 1998) (holding that independent distributor could not be held liable for negligent failure to inspect or test); *Curry v. Sile Distribs.*, 727 F. Supp. 1052, 1054 (N.D. Miss. 1990) ("A distributor owes no duty to inspect a product for latent defects . . . ."); *Richardson v. Michelin*, No. 95-CV-0760E(H), 1998 WL 135804, at *5 (W.D.N.Y. Mar. 18, 1998) (retailer "did not have duty to inspect or test the [product]").

25.   Moreover, even if superior knowledge could create a duty to warn on the part of a distributor, *see USAA Cas. Ins. Co. v. PM Terminals, Inc.*, No. 3:12cv868 (REP), 2013 U.S. Dist. LEXIS 139942, at *17 (E.D. Va. Aug. 5, 2013), plaintiffs cannot demonstrate such knowledge here. As the attached declaration of David Donahower explains, Chesapeake was not "involved with the design, manufacture, development, testing, labeling, or packaging of DePuy orthopedic implants, including the products allegedly at issue in this case." *See* Donahower Decl. ¶ 3. Accordingly, "Chesapeake does not have, and never has had, any personal knowledge of or any reason to believe that the DePuy total hip replacement products allegedly implanted in the plaintiff had a manufacturing, design or other defect." *Id.* ¶ 14.

26.   For all of these reasons, there is no possibility that plaintiff would prevail on a negligence claim against Chesapeake. *See Askew v. DC Med., LLC*, No. 1:11-cv-1245-WSD,

2011 WL 1811433, at *14 (N.D. Ga. May 12, 2011) (denying remand where medical device distributor "testified unequivocally in [its] declaration that DC Medical did not have knowledge of any defect prior to distribution of the device at issue").

27. **Negligent Misrepresentation.** Plaintiffs' claim against Chesapeake for negligent misrepresentation is also doomed to fail for two reasons:  (1) plaintiffs do not identify a single misrepresentation that was made to Ms. Corette or her doctor by Chesapeake; and (2) plaintiffs fail to establish any connection between any actions by Chesapeake and Ms. Corette's implantation with the Pinnacle Cup System that could possibly satisfy the reliance element of that claim.

28. A cause of action for negligent misrepresentation under Virginia law requires a plaintiff to prove, *inter alia*, that the defendant engaged in a misrepresentation and that the plaintiff relied on it. *See, e.g., GIV, LLC v. IBM*, No. 3:07CV067-HEH, 2007 U.S. Dist. LEXIS 30168, at *14 (E.D. Va. Apr. 24, 2007) (noting that both intentional-fraud and negligent-misrepresentation claims require "a false representation" and "reliance by the party misled") (internal quotation marks and citation omitted); *Branin v. TMC Enters., LLC*, 832 F. Supp. 2d 646, 653-54 (W.D. Va. 2011) (explaining that negligent misrepresentation "requires a showing by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation") (applying Virginia law).

29. Here, plaintiffs have not identified any specific statements that Chesapeake allegedly made to them (or Ms. Corette's doctor) regarding the safety or efficacy of the Pinnacle Cup System.  Nor have they alleged that they (or Ms. Corette's doctor) relied on any such statements in selecting the Pinnacle Cup System.  Rather, the Complaint includes only vague

11

allegations that Chesapeake, at some unspecified time and place "provided information to [plaintiff's] orthopedic surgeon" regarding the Pinnacle Cup System. (*See, e.g.,* Compl. ¶ 64.) Such bare allegations are inadequate to establish a "possibility" that plaintiffs can recover against Chesapeake on their negligent-misrepresentation claim. *See, e.g., Aronis v. Merck & Co.,* No. CIV S-05-0486 WBS DAD, 2005 WL 5518485, at *1 (E.D. Cal. May 3, 2005) (finding fraudulent joinder of a distributor where "plaintiff d[id] not allege that [the distributor] contributed in any way to her injuries"; "[t]o state a claim against a defendant, a plaintiff must allege a causal connection between the injury and the conduct of that defendant"); *see also BBG Props.,* 342 F. App'x at 920 (affirming trial court's refusal to remand case to state court where the plaintiff "had not stated its fraud claim with sufficient particularity" with regard to the non-diverse defendant as required under Rule 9(b)); *Druker v. Fortis Health,* No. 5:06-cv-00052, 2007 U.S. Dist. LEXIS 402, at *11-13 (S.D. Tex. Jan. 4, 2007) (finding fraudulent joinder where the plaintiff "failed to lodge any meaningful factual allegations" and did not allege specific material misrepresentations upon which he relied as required by Rule 9(b)).

30. **MCPA.** While plaintiffs assert a claim under the MCPA, such a claim is not cognizable under Maryland's choice-of-law rules because Ms. Corette received her hip implant in Virginia. *See Withers v. Riggs Nat'l Bank,* No. 87-2530, 1987 U.S. App. LEXIS 19473, at *3-4 (4th Cir. Sept. 2, 1987) (applying consumer protection law of the District of Columbia, not Maryland, because "the alleged tort took place in Washington, D.C., where the impact of the letter produced the injury").

31. But even if the MCPA applied, such a claim would have no possibility of success against Chesapeake for the same reasons that doom plaintiffs' negligent-misrepresentation claim against it. *See* Md. Code Ann., Com. Law § 13-301(9) (defining unfair or deceptive trade

practices as the "misrepresentation" or "knowing concealment" of a material fact in connection with the promotion or sale of a consumer good); *Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 111 (D. Md. 2010) (unfair-and-deceptive-trade-practices claim under the MCPA "require[d] plaintiffs to prove reliance").

32.   **Loss of Consortium.** Finally, plaintiff John Corette's claim for loss of consortium cannot succeed against Chesapeake because Virginia does not recognize a common-law claim for loss of consortium. *See Carey v. Foster*, 345 F.2d 772, 778 (4th Cir. 1965) (stating that because Va. Code Ann. § 55-36 bars a husband from recovery for loss of consortium, a wife is similarly precluded from recovering based on a theory of loss of consortium); *Smith v. Chambers*, No. 2:02CV10152, 2002 U.S. Dist. LEXIS 24857, at *1 (W.D. Va. Dec. 31, 2002) (stating that no cause of action for loss of consortium exists under Virginia law).

B.   **Amount In Controversy**

37.   Plaintiffs in this action seek "judgment against Defendants for compensatory damages in an amount exceeding $75,000, plus costs." (*Id.* ¶ 173.) Accordingly, the $75,000 jurisdictional threshold is satisfied. *See Synagro-WWT, Inc. v. Louisa Cnty.*, No. 3:01CV00060, 2001 U.S. Dist. LEXIS 10974, at *3-4 (W.D. Va. July 17, 2001) ("[I]t is generally acknowledged that the amount claimed in good faith by the plaintiff controls jurisdiction.").

II.   **REMOVING DEFENDANTS HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.**

38.   Defendant DePuy International was served with plaintiffs' Complaint on August 18, 2014. Defendants Johnson & Johnson and Johnson & Johnson Services, Inc. were served on August 19, 2014. Defendants DePuy and DePuy Products, Inc. were August 29, 2014. Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

39.    The Circuit Court for Prince George's County is located within the District of Maryland. *See* 28 U.S.C. § 100(2).

40.    None of the removing defendants is a citizen of the State of Maryland, the State where this action was brought. *See* 28 U.S.C. § 1441(b).

41.    While removal based on traditional diversity jurisdiction generally requires consent of all defendants, it is well settled that only properly joined defendants need to consent in removal. *See Gephardt v. Mortg. Consultants, Inc.*, No. JFM-10-1537, 2010 U.S. Dist. LEXIS 115799 (D. Md. Oct. 29, 2010) (holding that diversity jurisdiction existed because in-state defendant who had never consented to removal was fraudulently joined); *Fleming v. United Teacher Assocs. Ins. Co.*, 250 F. Supp. 2d 658, 663 (S.D. W. Va. 2003) ("application of [the consent] requirement to improperly or fraudulently joined parties would be nonsensical, as removal in those cases is based on the contention that no other proper defendant exists") (internal quotation marks and citation omitted).  Here, Chesapeake is fraudulently joined, and thus need not consent to removal.

42.    No previous application has been made for the relief requested herein.

43.    A copy of the complaint is attached as Exhibit 2.  Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for plaintiffs and a copy is being filed with the Clerk of the Circuit Court for Prince George's County.

WHEREFORE, removing defendants respectfully remove this action from the Circuit Court for Prince George's County, in the State of Maryland, bearing Number CAV-14-19666, to this Court.

Respectfully submitted,

Richard M. Barnes (Fed. Bar No. 00669)
rmb@gdldlaw.com
Derek M. Stikeleather (Fed. Bar No. 27815)
dstikeleather@gdldlaw.com
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street – 20th Floor
Baltimore, Maryland  21202
(410) 783-4000 (telephone)
(410) 783-4040 (fax)

COUNSEL FOR DEFENDANTS DEPUY ORTHOPAEDICS, INC., DEPUY PRODUCTS, INC., DEPUY INTERNATIONAL LIMITED, JOHNSON & JOHNSON AND JOHNSON & JOHNSON SERVICES, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of September, 2014, a copy of the foregoing was served via first-class mail on:

Christopher H. Mitchell
STEIN MITCHELL MUSE CIPOLLONE
&BEATO, LLP
1100 Connecticut Ave., NW, Suite 1100
Washington, DC 20036

Altom M. Maglio
Ilyas Sayeg
MAGLIO CHRISTOPHER & TOALE, PA
1605 Main Street, Suite 710
Sarasota, FL 34236

_____
Derek M. Stikeleather

4830-1173-5326, v. 1

16